AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

United States of America )
v. )
ANTHONY PEPE ) Case No.
) 18-2028 (JS)
)
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January through June 25, 2018__ in the county of __Camden and elsewhere__ in the _____ District of __New Jersey__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 846 | Conspiracy to distribute and possess with intent to distribute oxycodone, as more fully described in Attachment A. |

This criminal complaint is based on these facts:

See Attachment B.

☑ Continued on the attached sheet.

_____
Complainant's signature

Stuart Sobin, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/25/2018

_____
Judge's signature

City and state: Camden, New Jersey

Honorable Joel Schneider, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY

By:_____

CHRISTINA O. HUD, Assistant U.S. Attorney

DIANA VONDRA CARRIG, Assistant U.S. Attorney

Date: June 25, 2018

## ATTACHMENT A

### COUNT ONE
### (Narcotics Trafficking Conspiracy)

From in or about January 2018 through the present, in Camden County, in the District of New Jersey and elsewhere, defendants

DANIEL WATSON,
ANTHONY PEPE, and
PRUSSIA HING,

did knowingly and intentionally conspire and agree with each other and with others, known and unknown, to distribute and possess with intent to distribute a mixture or substance containing a detectable amount of oxycodone, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C),

In violation of Title 21, United States Code, Section 846.

1

## ATTACHMENT B

I, Stuart Sobin, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Where statements of others are related herein, they are related in substance and part. I have not set forth each and every fact that I know concerning this investigation because this Affidavit is being submitted for the limited purpose of establishing probable cause to support this Criminal Complaint and the issuance of arrest warrants. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND

1. At the times relevant to this Criminal Complaint,

    a) DANIEL WATSON, a resident of Bellmawr, New Jersey, was involved in the trafficking of narcotics, including, but not limited to, unadulterated and pressed[1] pills of oxycodone;

    b) ANTHONY PEPE, a resident of Cherry Hill, New Jersey, was involved in the trafficking of narcotics, including, but not limited to, unadulterated and pressed pills of oxycodone;

    c) PRUSSIA HING, a resident of Philadelphia, Pennsylvania, was involved in the trafficking of narcotics, including, but not limited to, unadulterated and pressed pills of oxycodone;

    d) A confidential informant ("CI")[2] worked with law enforcement as part of an investigation involving federal and local law enforcement targeting oxycodone traffickers in and around

---

[1] Based on my training and experience, I know that drug traffickers often exploit high consumer demand for prescription medications with a high degree of abuse, such as oxycodone, by breaking down the pills, mixing them with other materials and/or dilutants, and then re-solidifying the material into tablet form to produce inexpensive, fraudulent prescription pills—a process known as "pressing." The equipment and materials necessary to produce these counterfeit drugs are widely available online, increasing potential opportunities for drug trafficking organizations.

[2] The CI is a paid informant and has provided information to law enforcement in connection with this and other matters related to narcotics trafficking. Law enforcement has determined that the information the CI has provided in connection with other matters was credible, and consistent with other information obtained during the investigation of such matters. In connection with this investigation, the CI provided information corroborated by other facts learned during the course of this investigation. Accordingly, law enforcement deems information provided by the CI to be credible.

1

the southern New Jersey and Philadelphia areas ("the Investigation"), including, but not limited to, WATSON, PEPE, and HING; and

e) An undercover law enforcement officer ("UC") participated in the Investigation, including observing the narcotics trafficking activities of WATSON, PEPE, and HING.

## THE INVESTIGATION

2. During the time period from approximately January 2018 through May 16, 2018, and at the instruction of law enforcement officers, the CI and/or the UC made eight purchases of oxycodone from WATSON, including three purchases during which co-conspirators PEPE and HING directly participated. As described more fully below, law enforcement has reason to believe that WATSON, PEPE, and HING are continuing to engage in actions in furtherance of a narcotics trafficking conspiracy.

3. Law enforcement officers conducted surveillance on each controlled purchase. The eight transactions involved several locations of sale and different members of the narcotics trafficking conspiracy:

a) The first three transactions occurred in Bellmawr, New Jersey, at a convenience near WATSON'S residence. The first sale occurred inside the store. The second sale occurred inside WATSON's vehicle, a 2001 silver Nissan Pathfinder. The third sale occurred inside the undercover law enforcement truck ("UC truck") in the store parking lot.

b) Transactions four and five occurred in the UC truck behind WATSON's residence in Bellmawr, New Jersey.[3]

c) The final three sales—transactions six through eight—occurred in Philadelphia, Pennsylvania near a hospital where PEPE is employed as an anesthesiology technologist. Transactions six through eight occurred inside WATSON's vehicle. During these same transactions, HING drove his own vehicle, a 2015 silver Dodge Journey, to and from the locations of the narcotics sales.

---

[3] For transactions one through five, law enforcement surveilled WATSON at his residence before each transaction, and followed WATSON directly to either the store or the road behind his residence, where the transactions occurred. After each of those transactions, law enforcement surveilled WATSON as he returned directly to his residence.

2

4. The eight oxycodone transactions are summarized in the below table:

| | DATE OF SALE | LOCATION OF SALE | QUANTITY OF DRUGS SOLD | PRICE | PERSONS DIRECTLY INVOLVED |
|---|---|---|---|---|---|
| 1 | 1-8-18 | Convenience Store Bellmawr, NJ | 50 pressed oxycodone pills (DEA Laboratory results) | $1,250 | CI, WATSON |
| 2 | 1-17-18 | Convenience Store Bellmawr, NJ (WATSON's vehicle) | 180 oxycodone pills (field tested positive) | $4,140 | CI, WATSON (UC drove the CI but was not actively involved) |
| 3 | 1-26-18 | Convenience Store Bellmawr, NJ (UC truck) | 150 oxycodone pills (field tested positive) | $2,200 | CI, UC, WATSON |
| 4 | 2-13-18 | WATSON's Residence, Bellmawr, NJ (UC truck) | 100 pressed oxycodone pills (field tested positive) | $2,200 | UC, WATSON |
| 5 | 3-6-18 | WATSON's Residence, Bellmawr, NJ (UC truck) | 200 pressed oxycodone pills (field tested positive) (DEA Laboratory results) | $4,400 | UC, WATSON |
| 6 | 3-27-18 | Hospital, Philadelphia, PA (WATSON's vehicle) | 150 oxycodone pills and 50 pressed Oxycodone pills | $4,400 | CI, WATSON, PEPE, HING |
| 7 | 4-13-18 | Hospital, Philadelphia, PA (WATSON's vehicle) | 100 pressed oxycodone pills | $2,200 | CI, WATSON, PEPE, HING |
| 8 | 5-16-18 | Hospital, Philadelphia, PA (WATSON's vehicle) | 200 oxycodone pills | $4,400 | CI, WATSON, PEPE, HING |

5. In total, the CI[4] and UC purchased 1,180 oxycodone pills during the eight transactions. Of this total amount, 500 pills were pressed and 680 pills were unadulterated. All of the pills strongly resembled actual 30 milligram oxycodone pills, in that they were the same size and shape as actual oxycodone pills.

6. After four of the controlled purchases, law enforcement conducted field tests of random pills, each of which indicated positive for the presence of oxycodone. In addition, all of the pills purchased were sent to the DEA Northeast Regional Laboratory for analysis. Law enforcement received DEA Laboratory Reports for transactions one and five, both of which confirmed that a representative sampling of the pills purchased during those transactions contained oxycodone. The DEA Laboratory Report for the first transaction showed that the pills consisted of approximately 23 milligrams of oxycodone, mixed with two additional prescription medications—codeine and methylphenidate (which is a methamphetamine salt known to be prescribed to treat Attention Deficit/Hyperactivity Disorder ("ADHD")). The DEA Laboratory Report for the fifth transaction showed that a sampling of the pills consisted of approximately 22 milligrams of oxycodone,[5] mixed with hydrocodone (another prescription pain medication).[6]

7. During the Investigation, law enforcement conducted surveillance and reviewed communications obtained through consensually recorded transactions between members of the narcotics conspiracy and the CI, in which WATSON and PEPE discussed the narcotics trafficking operation and WATSON, PEPE, and HING were observed engaging in narcotics transactions. In addition, law enforcement officers obtained toll records for cellular telephones registered to WATSON, PEPE, and HING. Law enforcement conducted a toll analysis, focusing on the dates of the eight oxycodone transactions. The toll analysis

---

[4] Consistent with standard law enforcement procedures, before each of the CI's controlled purchases described herein, law enforcement: (i) searched the CI for firearms, money and contraband, with negative results; (ii) furnished the CI with pre-recorded funds to purchase the oxycodone pills; (iii) sent the CI to the prearranged meeting location in the company of a law enforcement officer; (iv) recorded via audio and video each of the controlled purchases; (v) arranged for a live transmitter so that law enforcement could hear the interaction of the CI during the transaction; and (vi) performed surveillance of each of the purchases. Similarly, after each of the controlled purchases, law enforcement: (i) met with the CI and a law enforcement driver at a prearranged location; (ii) obtained the oxycodone pills and recording devices from the CI; (iii) searched the CI for firearms, money, and other contraband, with negative results; (iv) debriefed the law enforcement driver; and (v) interviewed the CI regarding the transaction.

[5] The DEA Laboratory's finding of between 22 to 23 milligrams of oxycodone per pill in the first and fifth purchases described above is consistent with the notion that those pills were pressed pills. By definition, a 30 milligram oxycodone pill contains 30 milligrams of oxycodone.

[6] As of this writing, DEA Laboratory Reports pertaining to the remaining transactions were not yet available.

4

showed that WATSON, PEPE, and/or HING were in regular communication—through phone calls and text messages—particularly on or around the dates and times of the controlled purchases.

### TRANSACTION 1: JANUARY 3, 2018

8. On or about January 8, 2018, the CI conducted a consensually recorded purchase of 50 pressed oxycodone pills from WATSON in a convenience store in Bellmawr, New Jersey. During that transaction, WATSON asked the CI if it was okay to do the deal in front of the CI's "boy" (referring to the CI's driver) and stated: "You want another 100 – we got 'em on deck. Just let me know." In my training and experience, I know that WATSON was referring to a future sale of another 100 oxycodone pills to the CI.

9. The recording for the drug purchase runs from approximately 12:36 p.m. to 1:09 p.m., which includes driving time. Toll analysis from the date of the buy showed the following:

- WATSON and PEPE exchanged text messages at approximately 12:02 p.m. and 12:04 p.m.
- WATSON and PEPE also exchanged text messages at approximately 1:11 p.m.
- WATSON texted PEPE again at 1:32 p.m.
- WATSON and PEPE also exchanged text messages at approximately 2:15 p.m. and 2:16 p.m.
- WATSON called PEPE at approximately 4:03 p.m.

### TRANSACTION 2: JANUARY 17, 2018

10. On or about January 17, 2018, he CI conducted a consensually recorded purchase of 180 oxycodone pills from WATSON in WATSON's vehicle in the parking lot of the convenience store in Bellmawr, New Jersey.

11. The recording for the drug purchase runs from approximately 12:56 p.m. to 1:25 p.m. Toll analysis that day showed:

- WATSON and PEPE exchanged text messages at approximately 6:58 a.m.
- WATSON texted PEPE at approximately 8:11 a.m.
- PEPE texted HING at approximately 9:07 a.m.
- HING responded to PEPE's text message at approximately 9:37 a.m.
- PEPE and HING exchanged text messages at approximately 9:38 a.m. and 9:41 a.m.
- PEPE texted WATSON at approximately 9:41 a.m.
- HING and PEPE exchanged six additional text messages between

5

   approximately 9:41 a.m. and 9:43 a.m.
- WATSON and PEPE exchanged text messages at 10:22 a.m.
- WATSON called PEPE at approximately 2:10 p.m.
- WATSON and PEPE exchange text messages at approximately 2:29 p.m.
- PEPE called WATSON at 4:49 p.m. and WATSON called PEPE at approximately 4:52 p.m.
- WATSON texted PEPE at approximately 5:26 p.m.
- WATSON called PEPE at approximately 8:12 p.m.
- WATSON again called PEPE at approximately 10:14 p.m.

### TRANSACTION 3: JANUARY 26, 2018

12. On or about January 26, 2018, the CI conducted a consensually recorded purchase of 150 oxycodone pills from WATSON in the UC truck in the parking lot of the convenience store in Bellmawr, New Jersey.

13. The recording for the drug purchase runs from approximately 11:57 a.m. to 1:22 p.m. Toll analysis showed:

- HING texted PEPE at 7:20 a.m. PEPE replied to his text at 7:25 a.m.
- PEPE and HING exchanged three more text messages from 7:30 a.m. to 7:31 a.m.
- WATSON and PEPE exchanged six text messages between 7:34 a.m. and 7:41 a.m.
- WATSON and PEPE exchanged three more text messages later between 9:12 a.m. and 9:14 a.m.
- WATSON and PEPE exchanged text messages at 9:42 a.m. and 9:43 a.m., and WATSON texted PEPE again at 10:27 a.m. and 10:50 a.m.
- PEPE called WATSON at 1:46 p.m.
- PEPE texted WATSON twice at 12:46 p.m. and 12:56 p.m.
- WATSON called PEPE at 3:30 p.m.
- WATSON called PEPE at 4:27 p.m. PEPE called him back at 4:33 p.m., and PEPE called WATSON again at 4:47 p.m.
- WATSON called PEPE at 7:06 p.m. and again at 10:22 p.m.

### TRANSACTION 4: FEBRUARY 13, 2018

14. At the direction of law enforcement, during a series of recorded calls and text messages, the UC arranged to purchase 100 oxycodone pills from WATSON for $2,200. As prearranged, the UC drove to the convenience store parking lot located in close proximity to WATSON's home. WATSON contacted the UC prior to the buy and changed the buy location to the road that runs

6

behind WATSON's house. WATSON contacted the CI prior to conducting the buy confirming that the UC could be trusted. WATSON texted the CI prior to the buy with the UC. WATSON texted: "Gonna meet with [the UC] that what you want me to do . . . everything's cool rite?" The CI responded: "Bro, of course. . . . I already told you we are good dudes . . . You already know it's only a few of us left." WATSON replied to the CI: "Ok brotha . . . .ttyl." In my training and experience, I know that WATSON was asking the CI whether the UC could be trusted to engage in a narcotics transaction.

15. On or about February 13, 2018, the UC conducted a consensually recorded drug purchase of 100 oxycodone pills from WATSON.

16. The recording for the drug purchase runs from approximately 12:19 p.m. to 12:45 p.m. Toll analysis showed:

- WATSON texted PEPE at 12:01 p.m.
- PEPE called WATSON at 1:57 p.m.

### TRANSACTION 5: MARCH 6, 2018

17. At the direction of law enforcement, during a series of recorded calls and text messages, the UC arranged to purchase 200 oxycodone pills from WATSON for $4,400 on or about March 6, 2018. As prearranged, the UC met WATSON on the road that runs behind WATSON's house. The two men made the sale inside of the UC truck while parked on the road behind WATSON's house.

18. During that buy, WATSON and the UC engaged in a consensually recorded conversation, WATSON told the UC that his source (later identified as PEPE) would only give WATSON 200 oxycodone pills at a time, stating:

> "I can only give you two, you gotta bring the money back to give you the other two. . . . everything I gotta do, I either gotta meet him in the city or at his house. Everything's on his terms. . . . That's how he feels comfortable and that's fine by me. . . . Cause otherwise I can't get them, so . . . This fucking game is getting really fucked up. . . . All right man, so this is $4400? . . . If you want two more in a day, just let me know. Or if you just want to wait for the 180 real ones next week, I'll give you them."

In my training and experience, and based on facts obtained during the Investigation, I know that WATSON was referring to the fact that his source,

7

PEPE, would only give WATSON 200 oxycodone pills at a time and that such transactions occurred at PEPE's home in New Jersey or PEPE's place of work in Philadelphia, and could occur on short notice. I further believe that WATSON distinguished between unadulterated and pressed pills, by offering to provide 180 "real"—meaning unadulterated— pills.

19. Toll analysis for the transaction showed significant contact between WATSON, PEPE, and HING. The recording for the drug purchase ran from approximately 1:37 p.m. to 2:08 p.m. Relevant toll analysis showed:

- PEPE and WATSON exchanged three text messages between 5:45 a.m. and 5:53 a.m.
- HING and PEPE exchanged four text messages between 6:07 a.m. and 6:09 a.m. Immediately following that text exchange, PEPE texted WATSON at 6:10 a.m.
- HING texted PEPE at 6:39 a.m. WATSON texted PEPE at 6:40 a.m. HING and PEPE exchanged text messages at 6:54 a.m. and 6:55 a.m.
- PEPE and WATSON exchanged seven text messages between 7:10 a.m. and 7:20 a.m.
- HING texted PEPE at 8:00 a.m. PEPE and HING exchanged text messages at 8:15 a.m.
- WATSON and PEPE exchanged text messages at 9:20 a.m. and 9:21 a.m.
- WATSON and PEPE exchanged four text messages between 10:20 a.m. and 10:22 a.m.
- HING texted PEPE at 10:52 a.m.
- PEPE and HING exchanged text messages at 11:24 a.m. and 11:25 a.m.
- WATSON and PEPE exchanged text messages at 11:54 a.m. and 11:55 a.m.
- PEPE and HING exchanged six text messages between 12:04 p.m. and 12:08 p.m.
- WATSON called PEPE at 12:11 p.m. PEPE called WATSON back at 12:57 p.m. Immediately following the call between WATSON and PEPE, PEPE called HING at 12:58 p.m.
- PEPE called HING at 1:16 p.m. Immediately following the call with HING, PEPE called WATSON at 1:18 p.m.
- WATSON called PEPE twice at 1:57 p.m. and 2:00 p.m.
- PEPE called WATSON at 4:42 p.m.
- WATSON called PEPE at 5:28 p.m.

### TRANSACTION 6: MARCH 27, 2018

20. At the direction of law enforcement, during a series of recorded calls and text messages, the CI arranged to purchase 200 oxycodone pills from WATSON for $4,400 on or about March 27, 2018. As prearranged, the CI met

8

WATSON at the convenience store in Bellmawr, New Jersey. Law enforcement officers surveilled the entire transaction, including watching WATSON leave his residence prior to the sale and drive in his vehicle to the convenience store to meet with the CI. At the store, WATSON told the CI to follow him. In addition, WATSON said: "I have 50, he only got 150, but I have 50 on me, so we'll put everything together there and we'll do it." In my training and experience and based on facts learned during the Investigation, I know that, in making this statement, WATSON meant that he had 50 oxycodone pills in his possession and that his supplier, PEPE, had 150 pills in his possession.

21. The CI followed WATSON to a convenience store in the vicinity of the hospital in Philadelphia where PEPE is employed. Once there, the CI met with WATSON in WATSON's vehicle. Thereafter, the CI exited WATSON's vehicle and re-entered the UC truck, and then proceeded to follow WATSON's vehicle to a street in the direct vicinity of the hospital. Once there, the CI exited the UC truck and got back into WATSON's vehicle. When the CI entered WATSON's car, WATSON was talking on the telephone, presumably to PEPE, and stated: "These guys, these guys [referring to the CI], wanted to come with me, they thought I was gonna drive off with their money (laughs). (Pause) (laughs). Alright buddy, I'll see ya." (Ends telephone conversation). In my training and experience and based on facts learned during the Investigation, I know that WATSON was explaining to PEPE why the CI joined WATSON during the narcotics transactions.

22. While waiting for PEPE in WATSON's vehicle outside the hospital in Philadelphia, WATSON vouched for PEPE to the CI and discussed the narcotics trafficking operation, stating: "You ain't got nothing to worry about, my man here is 100% legit. . . . He works at the hospital right here. This dude is 100% legit. . . . I been doing this for fuckin' two years now, man. . . . This is where I gotta come, I gotta come here, bam, I get your things and go right home. . . . I move a lotta fuckin pills . . . This is the only guy I got man that's got 'em when like I call, he has them." In my training and experience, and based on facts obtained during the Investigation, I know that WATSON was referring to the fact that PEPE worked at the hospital in Philadelphia and was readily able to obtain oxycodone pills for sale.

23. During the conversation between WATSON and the CI in WATSON's vehicle, WATSON also told the CI that PEPE "gets fuckin' awesome weed, too. . . . [F]uckin' best of the best, top of the line shit. . . . I got some shit the other day . . . top of the line." WATSON said that PEPE charged $2,700 for it [believed to refer to the price for pound], which was expensive but worth it because of the high quality. In my training and experience, I know that WATSON was referring to PEPE's ability to readily obtain high quality marijuana for sale.

9

24. Shortly thereafter, by way of surveillance, law enforcement observed, PEPE exit the hospital wearing scrubs and get into the rear passenger seat of WATSON's vehicle. During the consensually recorded transaction in WATSON's vehicle, WATSON, PEPE, and the CI engaged in the following discussion, in substance and in part:

| | |
|---|---|
| WATSON: | Hey, you got the pills? |
| PEPE: | You got the money? |
| WATSON: | I got the money. . . . |
| PEPE: | 150, right? |
| WATSON: | Yeah, 150. I have your 50 already. . . . There's 50 there, 200 ... told you bro, it ain't nothin. . . . Straight outta the hospital. |

Based on my training and experience, I know that WATSON and PEPE were discussing the sale of 200 oxycodone pills.

25. Law enforcement surveillance officers observed PEPE exit WATSON's vehicle and get into a 2015 silver Dodge Journey. Pennsylvania Department of Motor Vehicle records showed that the Journey was registered as a leased vehicle to PRUSSIA HING at his residence in Philadelphia. Approximately four minutes later, PEPE exited the HING's vehicle, and used a key card to enter the hospital.

26. Law enforcement followed HING drive his vehicle and park it in the vicinity of his home residence in Philadelphia. Officers observed HING exit the vehicle and thereafter terminated surveillance to avoid compromising the Investigation.[7]

27. The recording for March 27, 2018 purchase runs from approximately 11:50 a.m. to 1:03 p.m. Toll analysis of PEPE, WATSON, and HING's cell phone records showed significant contact between the three men:

---

[7] During the March 26, 2018 transaction, law enforcement officers utilized video-recorded aerial surveillance, which showed the movements of WATSON, PEPE, and HING at various times, including:

| | |
|---|---|
| 12:40 p.m. | PEPE got into the rear passenger side of WATSON's vehicle, and the CI exited WATSON's vehicle and got back into the UC truck; |
| 12:43 p.m. | WATSON got out of his vehicle, walked to the rear passenger side, and appeared to let PEPE out of the car, then got back in the driver's seat; |
| 12:44 p.m. | PEPE and WATSON engaged in conversation with PEPE on foot and WATSON slowly driving his car before PEPE entered HING's vehicle; |
| 12:47 p.m. | PEPE got out of the front passenger seat of HING's vehicle, and walked back to the hospital while HING drove away. |
| 12:52 p.m. | HING parked his vehicle in the vicinity of his residence, got out, and walked toward his residence. |

10

- WATSON and PEPE exchanged text messages at 5:50 a.m. Immediately thereafter, PEPE texted HING at 5:51 a.m. and WATSON at 5:52 a.m. HING and PEPE exchanged texts at 5:52 a.m. and 5:53 a.m. PEPE texted WATSON at 5:54 a.m. HING and PEPE exchanged three text messages at 5:54 a.m. and 5:55 a.m. WATSON texted PEPE at 5:55 a.m.
- WATSON texted PEPE at 6:42 a.m.
- PEPE texted WATSON twice at 6:47 a.m. and immediately thereafter texted HING at 6:47 a.m. WATSON and PEPE exchanged six text messages at approximately 6:48 a.m.
- PEPE called WATSON at 10:55 a.m.
- PEPE texted HING at 7:05 a.m.
- PEPE and WATSON exchanged text messages at 7:20 a.m. and 7:21 a.m. WATSON again texted PEPE at 7:28 a.m. PEPE and HING exchanged text messages at 7:31 a.m. and 7:33 a.m.
- PEPE called HING at 12:15 p.m.
- PEPE called WATSON at 12:31 p.m.
- WATSON texted PEPE at 1:10 p.m. WATSON again texted PEPE at 4:10 p.m.

## TRANSACTION 7: APRIL 13, 2018

28. At the direction of law enforcement, during a series of recorded calls and text messages, the CI arranged to purchase 100 oxycodone pills from WATSON for $2,200 on or about April 13, 2018.

29. Before the transaction, law enforcement officers set up surveillance on HING's residence and the area by the hospital in Philadelphia. At approximately 12:50 p.m., law enforcement officers observed HING leave his residence, get into this vehicle, and drive directly to a convenience store across from the hospital.

30. As prearranged, the CI met WATSON in the vicinity of the hospital in Philadelphia. The CI got into WATSON's vehicle. Law enforcement officers observed PEPE exit the hospital, cross the street, and approach the driver's side of HING's vehicle. Law enforcement observed PEPE lean in through HING's window, and retrieve a small object and place it in the chest pocket of his blue hospital scrubs. PEPE then walked a short distance from HING's vehicle to WATSON's vehicle, and got into the backseat. Upon entering WATSON's vehicle, WATSON, PEPE, and the CI engaged in a discussion about PEPE's ability to obtain oxycodone and other narcotics from the hospital and from PEPE's supplier, HING:

11

| | |
|---|---|
| PEPE: | I'm a middle man. |
| WATSON: | Can you get fentanyl or dope? |
| PEPE: | . . . I can get the fentanyl but I can't get fentanyl like that. It doesn't happen you know what I'm saying, I might get you one vial here or there but I can't get enough to supply a corner. You know what I'm talking about. |
| WATSON: | But a bottle what do you mean a bottle? |
| PEPE: | Fentanyl comes in like bottles. . . . I work, I work in an operating room so we get fentanyl IV's. . . . I can't get it like that, I only get leftover shit, you know what I'm saying? . . . The thing is if you cut the dope with the fentanyl. The fentanyl is five times more addicting than heroin. So if you cut it with the fentanyl its more addicting, you know that. Fentanyl is more addicting than heroin, that's why you cut it with the fentanyl. 'Cause when you cut that's what they want. They want that shit not the regular clean dope. They don't want straight dope, they want the shit cut with fentanyl. Because it's making them come back for more, so instead of doing one bag now you're doing four or five bags. |
| WATSON: | Yeah, he knows the game. |
| PEPE: | I just know from working. |
| WATSON: | Just give me one for right now. |
| PEPE: | You want one or two? |
| WATSON: | I want two. |
| CI: | There a hundred there? |
| WATSON: | Yeah, I got a hundred you got a hundred. |
| PEPE: | I don't even count them, the guy just gives them to me, I'm going to go inside and give him the money right now. He's waiting there. I get them from him, give them to you, then go back to work. . . . He's a Chinese guy that's what it is. [U/I] They are the ones getting everything in. Years ago it was the Italian mob. |

Based on my training and experience, I know that WATSON and PEPE were discussing the sale of 200 oxycodone pills, as well as the potential to sell and/or acquire materials containing fentanyl, heroin, and/or marijuana. Based

12

on the facts learned during the Investigation, I also know that, in referring to "the guy" and the "Chinese guy," PEPE was referring to his supplier, HING.

31. Following the transaction, law enforcement observed, through surveillance, WATSON's vehicle move and park next to HING's vehicle sitting outside a convenience store across from the hospital. Law enforcement observed PEPE get out of the backseat of WATSON's vehicle and walk to HING's vehicle. PEPE handed HING a package, believed to contain proceeds from the drug sale, and then returned to the hospital.[8]

32. Law enforcement continued to surveil HING, and observed HING stop on South 6th Street in Philadelphia in the vicinity of his residence, and pick up a blond woman, believed to be a family member of PEPE. Officers continued their surveillance while HING picked up another woman, and eventually terminated their surveillance after observing HING park this vehicle in the vicinity of 5th and South Streets, where he and the two women exited the vehicle.

33. Toll records show the communications between WATSON, PEPE, and HING during this time period. The recording for the drug purchase runs from approximately 12:33 p.m. to 1:44 p.m. Toll analysis showed:

- WATSON and PEPE exchanged three text messages at 5:29 a.m. and 5:30 a.m.
- WATSON and PEPE exchanged text messages at 6:49 a.m.
- HING texted PEPE at 7:09 a.m. and PEPE and HING exchanged text

---

[8] During the April 13, 2018 transaction, law enforcement officers utilized video-recorded aerial surveillance, which showed the movements of WATSON, PEPE, and HING, at various times, including:

| Time | Event |
|---|---|
| 12:49 p.m. | HING exited his residence and entered his vehicle; |
| 12:58 p.m. | HING's vehicle parked in front of the convenience store; |
| 1:16 p.m. | PEPE walked from the hospital to HING's vehicle parked in front of the convenience store; |
| 1:17 p.m. | PEPE poked his head into the passenger front window of HING's vehicle and walked away after putting an object in his front chest pocket; |
| 1:18 p.m. | PEPE stopped near a coffee shop parking lot and appeared to be utilizing a cell phone (which corresponds to toll records showing PEPE called WATSON at approximately 1:18 p.m.) |
| 1:20 p.m. | PEPE arrived at WATSON's vehicle and entered the rear passenger door; |
| 1:23 p.m. | The CI exited the front passenger door of WATSON's vehicle and entered the UC truck; |
| 1:24 p.m. | WATSON's vehicle parked behind HING's vehicle near the convenience store, WATSON walked around to the passenger door, PEPE exited and the two men appeared to shake hands; |
| 1:25 p.m. | WATSON got back into his vehicle and drove off while PEPE walked to the front driver's window of HING's vehicle and appeared to hand an object to HING, and then continued to walk back to the hospital. HING's vehicle left the area and went in the direction of HING's residence. |

13

      messages at 7:10 a.m.
- PEPE and HING exchanged text messages at 7:38 a.m., and again at 8:03 a.m.
- PEPE texted Watson at 8:03 a.m. and PEPE texted HING at 8:09 a.m. WATSON responded to PEPE's text at 8:11 a.m. PEPE and HING exchanged five text messages between 8:15 a.m. and 8:37 a.m.
- WATSON called PEPE at 12:36 p.m. PEPE called WATSON at 1:08 p.m. and again at 1:18 p.m.

### TRANSACTION 8: MAY 16, 2018

34. At the direction of law enforcement, during a series of recorded calls and text messages, the CI arranged to purchase 200 oxycodone pills from WATSON for $4,400 on or about May 16, 2018. As prearranged, the CI met WATSON at a convenience store in the vicinity of the hospital in Philadelphia. The CI exited the UC truck and got into WATSON's vehicle.

35. Before the transaction, law enforcement officers set up surveillance on HING's residence Residence and also in the vicinity of the hospital. At approximately 1:09 p.m., law enforcement officers observed HING leave his Residence, get into his vehicle, and drive directly to the convenience store across from the hospital in Philadelphia.

36. While waiting for PEPE, during a consensually recorded transaction in WATSON's vehicle outside the hospital in Philadelphia, WATSON and the CI engaged in a conversation about a recent interaction WATSON had with PEPE and HING, in which WATSON told the CI:

> "The other day I think I seen the head guy. PEPE didn't like that. Like the head dude where the pills are coming from. I'm not, see I'm not like that. I don't wanna cut PEPE out because I don't know the guy. And God forbid if something happens, at least PEPE, he always guarantees my money. You know what I mean, because I know where he lives. He lives in Cherry Hill. He said, listen if there is ever a problem, I guarantee your money. Nobody, you know what I mean, no one gives you that guarantee. You don't want the pills, you bring them back and I'll give you your money back. I can't cut the guy out for a little bit of money. Why would I do that? But it would be nice to go to the head guy, wouldn't it?"

When the CI inquired about the "head guy," WATSON said: "It was a Chinese guy. Asian kid."

14

Based on facts learned during the Investigation, I know that WATSON was referring to HING during this conversation.

37. Shortly thereafter, law enforcement observed PEPE exit the hospital and approach HING's vehicle on the street outside the hospital. PEPE engaged in conversation with HING through the passenger window of HING's vehicle, and law enforcement officers observed PEPE toss an empty surgical mask through HING's open passenger window. HING passed the surgical mask back to PEPE with what appeared to be an object hidden in the mask. PEPE walked with the surgical mask in hand from HING's vehicle car to WATSON's vehicle, and got into the backseat.

38. During a consensually recorded transaction in WATSON's vehicle, WATSON, PEPE, and the CI engaged in a discussion about PEPE's ability to obtain more oxycodone from HING, with PEPE stating: "Yeah, yeah, this guy, he don't, this fucking guy don't care. . . . Fucking Chinese dude. (U/I) I said, listen, people want these, they don't want those fucking other ones. (U/I) Cut the dope with it." Based on my training and experience and facts learned during the Investigation, I know that PEPE was referring to HING's ability to obtain oxycodone pills for sale, as well as the pressing of certain pills prior to sale.

39. Following the transaction, law enforcement observed PEPE get out of the backseat of WATSON's vehicle and walk back to HING's vehicle. PEPE handed HING the surgical mask, which was believed to contain proceeds from the drug sale. PEPE then walked back to the hospital and HING drove away from the area. Law enforcement observed HING make several stops prior to returning to his residence.

40. The recording for the May 16, 2018 purchase runs from approximately 12:27 p.m. to 1:45 p.m. Toll analysis of WATSON, PEPE, and HING's cell phone records showed significant contact between the three men on the date of the sale:

- WATSON and PEPE exchanged text messages at 5:12 a.m. and 5:16 a.m.
- PEPE and HING exchanged four text messages between 5:50 a.m. and 5:52 a.m.
- WATSON texted PEPE twice at 7:07 a.m. and 7:13 a.m.
- PEPE texted HING at 7:31 a.m. HING and PEPE exchanged text messages at 7:32 a.m. PEPE and WATSON exchanged text messages at 7:33 a.m.

15

- WATSON texted PEPE at 7:58 a.m. PEPE called WATSON at 8:03 a.m. PEPE texted WATSON at 8:05 a.m.
- HING and PEPE exchanged six text messages between 8:08 a.m. and 8:11 a.m. They exchanged texts again at 8:16 a.m. and 8:18 a.m.
- PEPE called WATSON at 1:06 p.m. PEPE called WATSON again at 1:11 p.m. WATSON called back at 1:13 p.m. HING called PEPE at 1:17 p.m.
- HING called PEPE at 4:40 p.m.

## CONTINUED NARCOTICS TRAFFICKING

41. Since the May 16, 2018 purchase and continuing through the week of June 11, 2018, the CI and WATSON have engaged in several telephone communications, during which WATSON has discussed his continuing drug trafficking with PEPE, and has offered to supply the CI with oxycodone. For example, on or about June 7, 2018, the CI consensually recorded a conversation with WATSON during which the two men discussed buying larger quantities of oxycodone from PEPE:

| | |
|---|---|
| CI: | Yeah. What's up with Peps? Anything good? |
| WATSON: | . . . We've been moving all week. |
| CI: | Oh yeah? Y'all be moving . . . been moving? |
| WATSON: | Oh yeah. Shaking and baking. |
| WATSON: | . . . Yeah, I been going . . . I been going to see him every day. I get like a 100 a day, you know? |
| CI: | Oh yeah? Who? Peps? |
| WATSON: | Yeah. |
| CI: | That is what it is man. |
| WATSON: | A 100. A 150 a day, you know what I mean? |
| CI: | Yeah? |
| WATSON: | We been cranking them motherfuckers out. |
| CI: | You fucking doing better than me. |

42. Based upon the Investigation and additional surveillance, I also believe WATSON, PEPE, and HING to be selling narcotics to persons other than the CI and UC. For example, on or about June 9, 2018 at approximately 8:25 a.m., while conducting surveillance of PEPE's residence in New Jersey, law enforcement observed PEPE exit his residence and meet with an unknown male. PEPE and the unknown male engaged in what appeared to be a hand-to-hand transaction. Officers observed the unknown male place a small object in his pants pocket after meeting with PEPE, before departing from the residence.

43.     Similarly, on or about June 15, 2018 at approximately 12:50 p.m., while conducting surveillance of HING's residence in Philadelphia, law enforcement observed HING exit his residence and approach the driver's side of a white colored sedan, which had briefly stopped in front of HING's residence. Officers observed HING reach into the driver's window of the sedan, and then return to his residence. Based on my training and experience, and facts learned during the Investigation, I believe that HING engaged in a narcotics sale at this time.